## Independent Taxi Service, Inc., v. International Brotherhood of Teamsters, etc., et al.

*Frank J. McDonnell*, for complainant.

*Alphonsus L. Casey* and *Sidney Hendler*, for respondents.

HOBAN, P. J., November 8, 1948.—This is a bill in equity brought by plaintiff, the operator of a taxicab service in the City of Scranton, against Local No. 229 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, hereinafter for the sake of brevity called the "union", the officers of the union and a group of employes of plaintiff company who went out on strike on August 3, 1948. The bill avers that no labor dispute exists between plaintiff, the union and plaintiff's employes, all of whom are members of the union, and that in contravention to an existing contract between plaintiff and the union providing, inter alia, for a system of arbitration of grievances, defendant-employes went on strike, the union supports and directs the strike, and that defendants have committed a number of illegal actions, including violence, threats of violence, insults or annoyance to members of plaintiff company, who as stockholders and cab owners operate cabs on the company business, to its patrons, business associates and to members of the public in the vicinity of plaintiff's office and in the area served by plaintiff's cabs; that the physical equipment of the company has been and is in danger of being damaged by defendants and that the picketing practices of defendants include various types of intimidation, coercion and other illegal activities. The bill asks for an injunction and damages.

The chancellor refused to issue an injunction on bill and affidavits alone, concluding from the pleadings that the matter involved a labor dispute and was subject to the provisions of the Labor Anti-Injunction Act. On a rule to show cause why a preliminary injunction should not be issued, hearings were had on November 1st and November 5th. Testimony was presented on behalf of plaintiff and defendants and full opportunity given to confront and cross-examine all witnesses. At the beginning of the hearings counsel for defendants

entered a special appearance and moved to dismiss the bill on the ground that the bill failed to comply in some respects with the Equity Rules; that it constituted no cause of action; that the court had no jurisdiction over the parties, and that the court had neither power nor jurisdiction to grant the relief sought. The motion was denied and testimony for plaintiff was presented. A similar motion was made by counsel for defendants at the end of plaintiff's testimony and the chancellor reserved ruling. Defendants' testimony was presented and counsel for the parties then argued the propriety of the proposed relief.

While the bill as a whole asks for a rather sweeping form of relief which the chancellor is not prepared to grant at this stage of the proceedings, nevertheless it contains averments of continued and threatened illegal actions in connection with the conduct of the strike by defendants which are clearly subject to control by a court of equity and we, therefore, deny the motion to dismiss the bill, without prejudice to defendants' right to test the question further by appropriate proceedings under Equity Rules 29 and 48.

Plaintiff is incorporated as a business corporation but is in reality something in the nature of a coöperative association of owners of taxicabs, who, in order to make full use of the earning power of their taxicabs, hire employes to drive them when the owners themselves are not so occupied. The company is authorized to issue 360 shares of stock. At the time of this action 180 shares were outstanding. In order to own and operate a taxicab in the company's business, one or more persons must own 10 shares of stock, which entitles them to operate a cab. The individual or group cab owners may hire employe-drivers. A company office is maintained to conduct the over-all management of the company, the dispatching system, the bookkeeping, the preparation of reports and all the other

incidentals to the management of such an enterprise. The stockholder-owners retain all the income from the use of their individual cabs except that when operated by an employe-driver the employe is entitled to 40 percent of the fares received during his driving shifts. The stockholder-owner provides for his own gasoline, oil and maintenance costs and the insurance on his vehicle and pays to the central office a weekly fee or assessment to cover the cost of operation.

In 1947 there were some 10 driver-owner stock-holders and some 35 employe-drivers. These employe-drivers had previously become the subject of an organization campaign by rival unions, with the result that in 1946 a consent election was had under supervision of the National Labor Relations Board and defendant union was elected the exclusive bargaining representative for plaintiff's employes, and subsequently the various processes of bargaining led to an agreement between the company and defendant union, dated February 10, 1948. This agreement provided for a union shop, a seniority system, supervision of the execution of the contract provisions through shop stewards, rates of pay, vacation privileges, qualifications for regular employes as distinguished from extra men, a call system for working shifts according to the seniority roster and a system for adjusting grievances by arbitration. In the latter part of 1947 and early in 1948 the company began expanding the number of its stockholder-owners, with the avowed policy of making the company so far as was possible a complete owner-driver organization. Since the owner-drivers are excluded from union membership, if the purpose was accomplished in full the result would be that all the employe-drivers would have to become stockholders and owners, or stockholder-owners would replace presently employed union drivers. The union conceived that this procedure threatened job security for

its members and in the course of time would make it, so far as this company is concerned, a bargaining agent for a nonexisting clientele. The matter became the subject of grievance, of a complaint and of a strike in May of 1948. The strike was settled and the employes went back to work, but there seems to be no agreement as to whether the company agreed to stop accepting or soliciting the purchase of any further stock interests, or whether it simply agreed that the persons presently employed would all be reëmployed without prejudice and given a reasonable opportunity to purchase an interest in the company according to its general plan.

During the summer at least four individuals between them bought two more 10-share lots and thus gained the right to operate two taxicabs in the company's business. Two of these purchasers were former employe-drivers of the company but two others were strangers, and the employes claim by reason of the entry of the strangers into the business, with their right to operate their cab for their own benefit, that they were "bumped down" and were deprived of work opportunities and income. There is a good deal of disagreement as to whether there was a loss of actual income to any of the employes of the company or not by the introduction of these new owner-operators into the organization. The company contends that none of its employes should have suffered any loss of income, that working shifts are always available, that in fact many times the company could not get drivers from its posted seniority roster because of the voluntary absences of the employes and the refusal of many of them to work more than a five-day week, even though the contract of the union called for a six-day basic work week.

The refusal to restrict this system and to prohibit these new owner-operators from operating cabs to the

detriment of the seniority rights of the employes led to the walkout which occurred on August 3, 1948.

Plaintiff argues that the foregoing situation does not constitute a labor dispute as defined in the Labor Anti-Injunction Act of June 2, 1937, P. L. 1198, 43 PS §206a et seq., because the controversy does not concern terms or conditions of employment, or does not concern the association or representation of the employes in employe-employer relationship, and further that the relief sought here is not governed by the provisions of the Labor Anti-Injunction Act because if this is a labor dispute, the strike or walkout by the union is one which is in disregard, breach of or violation of a valid subsisting labor agreement to which situation the restrictions of the Labor Anti-Injunction Act do not apply. See Act of June 9, 1939, P. L. 302, 43 PS §206d(a). We cannot agree with the contention of plaintiff, for it seems to us that anything which interferes with or threatens to interfere with an employe's right to work in accordance with the provisions of a labor agreement is a serious matter to him and to his union. Job security is most important to the workman and a threat to it constitutes a legitimate labor grievance and the subject of adjustment by bargaining or negotiation.

It is not a question as to whether the method of ownership and operation of a company sought to be completed by its present owners is a legitimate one from the legal standpoint. People succeed in gaining economic advantage over others by any number of varieties of legal and legitimate means, but in the employe-employer relationship when a means which may be legally proper offers a threat to an employe's economic status, his only defense against that threat is to exert his own economic force, exercised through his unions, to protect his position. The resolution of the difficulty is a proper subject for bargaining and

refusal to make a satisfactory adjustment by agreement, arbitration or otherwise is a justification for an employe to exert his economic force by combined action with his fellow employes. The wisdom of the position that the employe takes in any such controversy is not the subject for action by the court, nor should the court's concept of the judgment or lack of it exhibited by the union group in a controversy affect the court's consideration of the legality of the methods adopted by the union to enforce what it conceives to be a desirable economic claim. The point is, the current situation is a labor dispute and therefore, that we are bound by the terms of the Labor Anti-Injunction Act in considering an injunction in this case. This includes requisite findings of fact as required by section 9 of the act.

The evidence indicates that after the start of the strike, which incidentally was advised against by the union officials, the striking employes proceeded to bring their case to the public by picketing. The office of plaintiff is in the Scranton office building and railroad station of the Delaware, Lackawanna & Western Railroad Company. Some 800 employes of the railroad are in the building at their daily work and the railroad station is a place of great activity in connection with the arrival and departure of passengers of the railroad company. As part of its undertaking plaintiff company is required to furnish taxicab service to the passengers using the railroad station. When the picketing commenced, single or double pickets were used to walk up and down on the sidewalk opposite the passenger entrance to the railroad station, in which was located plaintiff's office, bearing signs stating that the Independent Taxi Service Company was unfair to its employes, and other similarly worded notices. For a short time in September this picketing line was extended across the vehicle entrance to the railroad

station, as a result of which union drivers of employers who had business at the railroad station refused to cross this picket line; hence the pickup of express and the delivery of supplies to the railroad station restaurant and to railroad cars was interfered with. This practice ceased after about five days, presumably as the result of a protest and a recognition by the union that it was clearly in the nature of a secondary boycott. A few weeks after the strike was instituted a motor vehicle, mounted with public address system, was added to the picketing procedure. This vehicle was stationed outside the company's office and would broadcast musical programs for periods of a half hour to an hour or more and by means of both a tape recorder and a voice transmitter the operator of the vehicle would broadcast messages concerning the strike. Later on another vehicle similarly equipped as a sound truck was added to the picketing organization. One or both of the sound trucks would follow a taxicab of plaintiff company, which picked up a passenger at the railroad station, directly in the rear of the cab, continually playing music and at times broadcasting either by records or direct methods announcements directed to the driver and the passenger as to the unfairness toward organized labor and union defendant of plaintiff company. On a number of occasions these sound trucks followed cabs and passengers to their destination and continued to broadcast their music or announcements, greatly magnified in sound volume, to the neighborhood while stationed in front of the passenger's destination. The testimony indicates more than 20 separate instances of such procedure of following taxicabs through the streets of the City of Scranton, and one in particular on a trip involving a number of miles through outlying country roads, with the obvious result that many of these trips led to unfortunate instances of insults, disparagement of passengers, the physical at-

tack by one of the employes on one of the drivers, threats by striking employes of similar treatment of others and in general an annoyance and disturbance to plaintiff. The chancellor himself during the pendency of these proceedings observed in the streets adjoining the court house in Scranton an actual illustration of the operation of the sound truck following one of plaintiff's cabs, and in the chancellor's opinion the following of a public service vehicle obliged to give service to passengers claiming such service, by a sound truck, playing at times music greatly magnified in volume, at other times giving out harsh, screeching and irritating sounds, or conveying messages in the same magnified sound volume, must be nerve racking to both drivers and passengers to the point where it may become a positive physical hazard to safe driving, particularly in city traffic. The practice is sought to be condoned as a legitimate exercise of the picketing privilege under the free speech constitutional guarantees. Free speech does not include the right to send two tons of steel hurtling through the streets at the immediate back of an individual who does not want to hear it and who has a serious job of driving through traffic with safety and care for passengers in an operation designed for the service of the public. At least one collision between the sound truck and one of plaintiff's cabs has occurred so far and in another instance a cab of plaintiff narrowly escaped being squeezed between two sound trucks which had boxed the cab between them and during which operation one of the sound trucks managed to knock down an advertising sign in a gasoline station, not to mention several near misses.

This court has in the past and will continue in the future to extend to the limit the employe's right to publicize his side of an industrial dispute and to grant

him every legitimate exercise of his right through peaceful picketing to induce others to support his side of a controversy, but when his conduct of such picketing involves the operation of prowl cars in a manner causing an extreme hazard to both the individuals concerned and to the public in general, it is time to protect the public by injunction if no other method will suffice.

It is argued that the instances of violence and threats are so infrequent as to constitute only the excesses which occasionally accompany labor disputes and should not be made the subject of the drastic action of injunction, with its possible penalties for violation. That the picketing by means of the cruising sound cars is intended to be continued in the manner above described is shown by the fact that complaints were received by this court of several instances of such behavior occurring on November 5th, the last day of the hearings. John A. Durkin, secretary, treasurer and business agent of the union, testified at the outset of the strike he instructed the striking employes as to methods of picketing, and particularly that the sound trucks were not to be played in front of the Lackawanna railroad station, particularly at times when bodies of war dead were being returned; that they were not to play in front of hospitals, schoolhouses and public buildings and that they were not to follow taxicabs or passengers. In spite of these instructions such actions continued down to and including the last day of the hearing.

Some weeks before the hearings were instituted, as a result of complaints, representatives of the strikers were called before the director of public safety and the chief of police of the City of Scranton and they agreed among other things that these sound trucks would not follow taxicabs carrying passengers. The continual conduct of this strike has shown that the striking em-

ployes have no intention of following or obeying the instructions of the police authorities or of their own leaders. Hence, we are warranted in the conclusion that this type of unlawful action will be continued unless restrained.

The acts of physical violence concerned were few in number and apparently confined to either actions or threats by one excitable individual. However, there was testimony to the effect that some of the language used over the public address systems installed on the trucks was of an insulting and provocative nature. We are informed that this is no longer possible because the voice microphones have been taken from the trucks, so that under present conditions they may only broadcast musical or voice recordings. We are not and do not by any action herein intend to deprive this union or the strikers from the opportunity to disseminate information by public address systems or otherwise in a legitimate and lawful manner. We do not attempt to decide whether the use of such vehicles at any given point, such as in proximity to the D. L. & W. railroad station, is a nuisance to be abated. If so, it must be under a different claim or on a showing by plaintiff either of special damage or of a public interest. There is some testimony that some telephone call stations of plaintiff company located at various parts of the city were damaged or interfered with by persons unknown, presumably by strikers. The damage concerned is so small as to not cause grave concern, nor does it seem to us to warrant an injunction against such type of action.

Under the evidence as we read it, there is a clear justification to stop the dangerous and equally unlawful practice of annoying and disturbing the vehicle drivers and passengers by following them with sound cars. Since the only proof of threats or violence seems

to have been directed against one individual, the ordinary process of criminal law ought to take care of this situation. We, therefore, find, after hearing the testimony of witnesses in open court, with opportunity for cross-examination thereof, in support of the allegations of the bill and of testimony in opposition thereto, the following facts:

1. Unlawful acts have been committed and will be committed of the following nature by the striking employes of plaintiff corporation, all of whom are named defendants, by the daily and continued following of taxicabs of plaintiff, containing patrons therein, by sound trucks broadcasting loud music or voice messages directly in the rear of taxicabs operated in the service of the company and by directing communications in a loud and magnified voice at the point of destination to both taxicab drivers and patrons in such a manner as to cause insult and annoyance to such individuals.

2. That substantial and irreparable injury to complainant's property will follow unless the practices noted in paragraph 1 are prohibited, to wit, that plaintiff's reputation for transporting passengers in a safe manner and in accordance with the safety regulations of the appropriate public agencies and the courtesy expected from the business will be seriously impaired and lost, with the consequent loss of good will and business.

3. Since the operation as described in paragraph 1 of these findings is in contravention of the orders of the police authorities of the City of Scranton and of the instructions of the officials of defendant union, greater injury will be inflicted upon complainant by the denial of relief against such conditions than will be inflicted upon defendants by the granting of an injunction against the continuance of such practices.

4. No item of relief to be granted is prohibited under section 6 of the Act of June 2, 1937, P. L. 1198.

5. Plaintiff has no adequate remedy at law.

6. That the public officials charged with the duty to protect complainant's property are unable to furnish adequate protection therefor, owing to the peculiar nature of the business in which plaintiffs are engaged, and the fact that these offenses can be expected to take place at times and in localities which cannot be reasonably anticipated.

## Decree

Now, November 8, 1948, upon consideration of the pleadings and the testimony and exhibits in the case, it is ordered, adjudged and decreed as follows:

Defendants and each of them are hereby prohibited and enjoined:

1. From following with vehicles of any type taxicabs of plaintiff company being duly operated in the business of plaintiff company, with intent to annoy by means of speech, music or other sounds the drivers of said taxicabs or the passengers therein, or by following such taxicabs by means of vehicles to endanger the safe operation of said taxicabs or the safe conduct of passengers therein, or by any means through the operation of following vehicles to distract in any manner the drivers of said vehicle while engaged in the driving thereof.

2. From embarrassing, insulting or vilifying the operators of taxicabs of plaintiff company while they are engaged in the operation thereof, or while they are accepting, waiting for or discharging passengers in such cabs at points of origin, temporary halts or at destination.

This injunction to be temporary until final hearing only. Security in the sum of $1,000 to be entered by plaintiff in accordance with section 10 of the Pennsylvania Labor Anti-Injunction Act.